**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

JOSHUA MARTHENS,

               Plaintiff,

      v.                             No. 3:15-CV-535
                                       (CFH)

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL
SECURITY,

               Defendant.
_____

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

**APPEARANCES:**                   **OF COUNSEL:**

Lachman, Gorton Law Firm       PETER A. GORTON, ESQ.
P.O. Box 89
1500 East Main Street
Endicott, New York 13761-0089
Attorneys for Plaintiff

Social Security Administration    EMILY M. FISHMAN, ESQ.
Office of Regional General Counsel
Region II
26 Federal Plaza, Rm. 3904
New York, New York 10278
Attorneys for Defendant

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

**MEMORANDUM-DECISION AND ORDER**

     Plaintiff Joshua Martens brings this action pursuant to 42 U.S.C. § 405(g)

seeking review of a decision by the Commissioner of Social Security ("Commissioner"

or "defendant") denying his applications for supplemental security income benefits

("SSI") and disability insurance benefits.  Dkt. No. 1 ("Compl.").  Plaintiff moves for a

finding of disability, and the Commissioner cross moves for a judgment on the

pleadings.  Dkt. Nos. 16, 17.  For the following reasons, the determination of the

Commissioner is remanded.[1]

## I. Background

Plaintiff, born on September 22, 1980, graduated from high school and

completed two years of college.  T at 23.  Plaintiff previously worked as a retail clerk, a

certified nurse's aid, a line inspector for IBM, a security installation assistant, and a

security guard.  Id. at 22.  Plaintiff protectively[2] filed a Title II application for a period of

disability and disability insurance benefits and a Title XVI application for supplemental

security income on July 27, 2012.  Id.[3] at 184-90; 191-97.  Plaintiff alleged a disability

onset date of July 6, 2011.  Id.  These applications were denied on November 29, 2012

Id.  T at 1-7.  Plaintiff requested a hearing before an administrative law judge ("ALJ"),

and a hearing was held on November 15, 2013, by video conference.[4]  Id. at 125-25;

29-90.  On January 21, 2014, ALJ Jennifer Gale Smith issued her decision wherein she

---

[1]  Parties consented to review of this matter by a Magistrate Judge pursuant to 28 U.S.C. §
636(c).  Dkt. No. 12.

[2]  "When used in conjunction with an 'application' for benefits, the term 'protective filing' indicates
that a written statement, 'such as a letter,' has been filed with the Social Security Administration, indicating
the claimant's intent to file a claim for benefits.  See 20 C.F.R. §§ 404.630, 416.340.  Allen v. Comm'r of
Soc. Sec., No. 5:14-CV-1576 (DNH/ATB), 2016 WL 996381, at *1 (N.D.N.Y.  Feb. 22, 2016), report and
recommendation adopted sub nom., 2016 WL 1020858 (N.D.N.Y. Mar. 14, 2016).

[3]  References to "T" stand for pages in the administrative transcript and reflect the pagination on
the lower right hand corner of the pages, rather than the pagination at the header generated by CM/ECF.

[4]  A hearing was originally scheduled for June 10, 2013, but that hearing was postponed to allow
plaintiff an opportunity to obtain representation.  T at 30-42.

concluded that plaintiff was not disabled. Id. at 11-24. Plaintiff's timely request for review by the Appeals Council was denied, making the ALJ's findings the final determination of the Commissioner.[5] Id. at 1-6. This action followed. See Compl.

## II. Discussion

### A. Standard of Review

In reviewing a final decision of the Commissioner, a district court may not determine de novo whether an individual is disabled. See 42 U.S.C. §§ 405(g), 1383(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982). Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)). The substantial evidence standard is "a very deferential standard of review . . . . [This] means once an ALJ finds facts, we can reject [them] only if a reasonable factfinder would *have to conclude* otherwise." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (internal quotation marks omitted).

---

[5] "[I]f . . . the [Appeals] Council denies the request for review, the ALJ's opinion becomes the final decision." Sims v. Apfel, 530 U.S. 103, 106-7 (2000).

Where there is reasonable doubt as to whether the Commissioner applied the proper legal standards, the decision should not be affirmed even though the ultimate conclusion reached is arguably supported by substantial evidence.  Martone v. Apfel, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999) (citing Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987)).  However, if the correct legal standards were applied and the ALJ's finding is supported by supported by substantial evidence, such finding must be sustained, "even where substantial evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]."  Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citation omitted); Venio v. Barnhart, 213 F.3d 578, 586 (2d Cir. 2002).

## B.  Determination of Disability[6]

"Every individual who is under a disability shall be entitled to a disability . . . benefit . . . ."  42 U.S.C. § 423(a)(1).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  Id. § 423(d)(1)(A).  A medically-determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available

---

[6]  Although the SSI program has special economic eligibility requirements, the requirements for establishing disability under Title XVI, 42 U.S.C. § 1382c(a)(3)(SSI) and Title II, 42 U.S.C. § 423(d) (Social Security Disability Insurance ("SSDI")), are identical, so that "decisions under these sections are cited interchangeably."  Donato v. Sec 'y of Health and Human Services, 721 F.2d 414, 418 n.3 (2d Cir. 1983) (citation omitted).

to him or her based upon age, education, and work experience.  Id. § 423(d)(2)(A).

Such an impairment must be supported by "medically acceptable clinical and laboratory

diagnostic techniques."  Id. § 423(d)(3).  Additionally, the severity of the impairment is

"based [upon] objective medical facts, diagnoses or medical opinions inferable from

[the] facts, subjective complaints of pain or disability, and educational background, age,

and work experience."  Ventura v. Barnhart, No. 04-CV-9018 (NRB), 2006 WL 399458,

at *3 (S.D.N.Y. Feb. 21, 2006) (citing Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir.

1983)).

The Second Circuit employs a five-step analysis, based on 20 C.F.R. §

404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is
> currently engaged in substantial gainful activity.
>
> If he [or she] is not, the [Commissioner] next considers
> whether the claimant has a 'severe impairment' which
> significantly limits his [or her] physical or mental ability to do
> basic work activities.
>
> If the claimant suffers such an impairment, the third inquiry is
> whether, based solely on medical evidence, the claimant has
> an impairment which is listed in Appendix 1 of the regulations.
> If the claimant has such an impairment, the [Commissioner]
> will consider him [or her] disabled without considering
> vocational factors such as age, education, and work
> experience; the [Commissioner] presumes that a claimant who
> is afflicted with a 'listed' impairment is unable to perform
> substantial gainful activity.
>
> Assuming the claimant does not have a listed impairment, the
> fourth inquiry is whether, despite the claimant's severe
> impairment, he [or she] has the residual functional capacity to
> perform his [or her] past work.
>
> Finally, if the claimant is unable to perform his [or her] past

> work, the [Commissioner] then determines whether there is
> other work which the claimant could perform.

Berry, 675 F.2d at 467 (spacing added).  The plaintiff bears the initial burden of proof to

establish each of the first four steps.  DeChirico v. Callahan,134 F.3d 1177, 1179-80

(2d Cir. 1998) (citing Berry, 675 F.2d at 467).  If the inquiry progresses to the fifth step,

the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in

gainful employment somewhere.  Id. at 1180 (citing Berry, 675 F.2d at 467).

In addition to the five-step sequential analysis, when a claimant alleges a mental

impairment, the ALJ is required to engage in a "special technique" or "psychiatric review

technique" at steps two and three of the sequential analysis, set forth in 20 C.F.R. §§

404.1520a(b)-(e), 416.920a(b)-(e), 416.920a(b)-(e); Petrie v. Astrue, 412 F. App'x 401,

403 (2d Cir.2011); Showers v. Colvin, 13-CV-1147 (GLS/ESH), 2015 WL 1383819, at

*4 (N.D.N.Y. Mar. 25, 2015) (citing Kohler v. Astrue, 546 F.3d 260, 265-66 (2d Cir.

2008)).  This technique "helps administrative judges determine at Step 2 of the

sequential evaluation whether claimants have medically-determinable mental

impairments and whether such impairments are severe."  Showers, 2015 WL 1383819,

at *4. The technique also helps ALJs to determine "whether [impairments] meet or are

equivalent in severity to any presumptively disabling mental disorder (a step 3 issue)."

Noble v. Comm'r of Soc. Sec., 13-CV-1443 (GLS/ESH), 2015 WL 1383625, at *3

(N.D.N.Y. Mar. 25, 2015).  Under this technique, ALJs "must specify the symptoms,

signs, and laboratory findings that substantiate the presence of the impairment(s) and

document [those] findings." 20 C.F.R. § 404.1520a(b).

Next, an ALJ is to assess the degree of functional limitation, or the impact the

claimant's mental limitations have on her "ability to function independently, appropriately, effectively, and on a sustained basis." Id. § 404.1520a(c). The ALJ must assess the plaintiff's degree of functional limitation in four functional areas: (1) "[a]ctivities of daily living," (2) "social functioning," (3) "concentration, persistence, and pace," and (4) "episodes of decompensation." Id. §§ 404.1520a(c)(3), 416.920a(c)(3). The ALJ must "rate" the functional degree of limitation in each of these four areas as "[n]one, mild, moderate, marked [or] extreme." Id. at §§ 404.1520a(c)(4), 416.920a(c)(4). If the ALJ finds the degree of limitation in each of the first three areas to be "mild" or better and identifies no episodes of decompensation, the ALJ "will generally conclude" that the plaintiff's impairment is "not severe." Id. § 404.1520a(d)(1). Where the plaintiff's mental impairment is "severe," the ALJ must "determine if it meets or is equivalent in severity to a listed mental disorder." Id. § 404.1520a(d)(2). "If yes, then the [plaintiff] is 'disabled.'" Petrie, 412 F. App'x at 408 (quoting 20 C.F.R. § 404.1520a(d)(2)).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)). However, a court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. See Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998). If supported by substantial evidence, the Commissioner's finding must be sustained "even where substantial

evidence may support the plaintiff's position and despite that the court's independent analysis of the evidence may differ from the [Commissioner's]." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). The Court must afford the Commissioner's determination considerable deference, and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

## C. ALJ's Decision

Applying the five-step disability sequential evaluation, the ALJ determined that plaintiff met the insured status requirements of the Social Security Act through September 30, 2016, and has not engaged in substantial gainful activity since July 6, 2011, the alleged onset date. T at 13. The ALJ found at step 2 of the sequential evaluation that during the period in question plaintiff had the severe impairments of affective disorder, anxiety disorder, personality disorder, asthma, and headaches. Id. At step 3, the ALJ determined that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id. at 15. The ALJ then concluded that plaintiff retained the residual functional capacity ("RFC") to:

> perform a full range of work at all exertional levels. The claimant should avoid concentrated exposure to respiratory irritants, such as dust, odors, fumes, and gases. He should not work in extreme hot or cold temperatures due to his asthma. He should not work at unprotected heights or

around moving machinery due to his headaches. The claimant is limited to a low stress environment defined as work involving occasional decision-making, occasional changes in the work setting, and occasional use of judgment. His work should be generally isolated with only occasional supervision.

Id. at 17. At step 4, the ALJ concluded that plaintiff was unable to perform his past relevant work. Id. at 21-22. The ALJ, after hearing testimony from vocational expert ("V.E."), and considering plaintiff's age, education, work experience, and RFC, concluded that there are jobs that exist in significant numbers in the national economy that plaintiff could perform, including the titles of mail clerk, addresser, and housekeeping cleaner. Id. at 22. Therefore, the ALJ concluded that plaintiff "has not been under a disability, as defined under the Social Security Act, from July 6, 2011, through the date of the decision." Id. at 23.

### D. Medical Evidence[7]

### 1. Kyle Webb, LCSW-R

Plaintiff's treating therapist, Kyle Webb, LCSW-R, in a "questionnaire" dated July 19, 2010, determined that plaintiff had no limitation or mild limitation[8] in his ability to

---

[7] Although plaintiff claimed physical disabilities in his applications for benefits, he alleges error only with respect to the ALJ's assessment of his mental health conditions; thus, the undersigned sets out only those medical records and assessments relevant to plaintiff's mental health conditions and treatment. Dkt. No. 16 at 3 ("This brief is limited to the effect that the psychiatric conditions had upon Plaintiff Joshua Marthens [sic] ability to deal with others, deal with stress, and the net diminishment to function caused by the psychiatric impairments with respect to Plaintiff's ability to remain on task during the day."). Further, although the Court does not set out each and every mental health record in this section, the Court has reviewed all relevant mental health records in rendering this Decision.

[8] The questionnaire defines mild/moderate as "minimal or slight limitations," moderate as "more than a slight limitation but the individual is still able to effectively function," marked limitations as "a serious limitation in this area. There is a substantial loss in the ability to effectively function," and extreme

"[s]ustain an ordinary routine without special supervision"; and moderate limitations in his abilities to "[m]aintain attention and concentration for extended periods of time," "[a]ccept instructions and respond appropriately to criticism from supervisors," and "[r]espond appropriately to changes in the work setting." T at 505-06. Ms. Webb proposed that plaintiff had marked limitations in his abilities to "[p]erform activities with a schedule, maintain regular attendance and/or be punctual within customary tolerances"; "[c]omplete a normal work day and work week without interruptions from psychological based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; "[i]nteract appropriately with the general public"; "get along with co-workers or peers without distracting them or exhibiting behavioral extremes"; and "[r]espond appropriately to ordinary stressors in the work setting." Id. She opined that plaintiff would reasonably be expected to miss more than three work days per month due to symptoms and treatment for his "mental condition." Id. at 506. Ms. Webb provided that plaintiff's diagnoses were "major depressive disorder, moderate, recurrent - chronic low mood/motivation"; "GID (Gender Identity Disorder) - Associated: Impaired Ability to Focus"; "GAD (Generalized Anxiety Disorder) - Extreme and Unpredictable Anxiety/Panic Attacks." Id. Throughout her treatment records, Ms. Webb indicated that she believed plaintiff may suffer from Asperger's Syndrome. Id. at 297, 337, 341, 496-97.

In a May 12, 2011 "addendum" to the questionnaire, Ms. Webb indicated that plaintiff's "[c]ondition has worsened, limitations more severe." T at 504. She provided

imitation as "a major limitation in this area. There is no useful ability to function in this area." T at 505.

that the "record reflects little discernable benefit to medications, accompanied by negative medication side effects.  With passage of time of treatment with minimal resolution of symptoms prognosis declines."  Id.  In a September 18, 2013 "addendum" to the questionnaire, cosigned by N. Nalio, M.D.,[9] Ms. Webb indicated that plaintiff's "[c]ondition has worsened, limitations more severe."[10]  Id. at 502.  Ms. Webb noted that plaintiff's "mental health diagnoses imply a chronic, biologically determined and – lacking effective and comprehensive (medical) treatment – deteriorating condition that becomes resistant to improvement over time, especially as psychosocial circumstances of financial and other stressors persist."  Id.

## 2. Consultative Examiner Cheryl Loomis, Ph.D.

Cheryl Loomis, Ph.D examined plaintiff on October 30, 2012, and noted that plaintiff "was cooperative and had adequate overall social skills."  T at 389.  Plaintiff was "appropriately dressed and well groomed" and "made appropriately [sic] eye contact."

---

[9]  The ALJ refers to this provider as Dr. Nailo.  Plaintiff refers to the provider as Dr. Naik.  The records are unclear as to the correct spelling.  For purposes of consistency, this decision will refer to this provider as Dr. Nailo.

[10]  Although plaintiff's counsel, at the beginning of this section of his brief, indicates that the ALJ improperly weighed the opinions of Dr. Nalio, the only reference he makes to Dr. Nalio is as follows.  "Both Webb and Loomis (and arguably Dr. Naik as well) imposed at least marked impairment in relating with others." (citing T at 506, 390).  These citations to the record are to (1) Dr. Loomis' consultative examination, and (2) Ms. Webb's questionnaire.  Ms. Webb's questionnaire is not cosigned by Dr. Nailo; however, a September 18, 2013 addendum to the questionnaire indicating that plaintiff's conditions have worsened is signed by Dr Nailo.  T at 503, 506.  Further, the Court does not find error with the ALJ's determination that "Dr. Nailo's endorsement of forms completed by the social worker is given little evidentiary weight" as plaintiff "testified that he has not seen Dr. Nailo" and "[t]here is no indication in the claimant's mental health treatment notes that he has been seen or evaluated by Dr. Nailo."  T at 503, 506; see Wright v. Colvin, 5:12-CV-440 (MAD/VEB), 2013 WL 3777187 at *5 (N.D.N.Y. July 17, 2013) (noting that, although a social worker's medical source statement was cosigned by a physician, "the Court could find no evidence that the unidentified physician had a treating relationship with plaintiff.").

Id.  His speech was "fluent and clear" and he demonstrated "adequate expressive and receptive language."  Id.  His thought processes were coherent, goal directed, and with "no evidence of thought disorder during this evaluation."  His affect was "at full range and appropriate to his speech and thought content."  Id.  His mood was euthymic, his sensorium clear, and he "was oriented x3."  Id. at 389-90.  Plaintiff's attention and concentration were "intact" as he was successful at counting, simple calculations, and serial 3s.  Id. at 390.  His recent and remote memory skills were "mildly impaired" as plaintiff was "able to immediately recall 3 out of 3 words, as well as those same 3 works after give minutes" and "was able to complete 3 out of 4 digits forward and 2 out of 3 digits backwards."  Id.  Plaintiff's cognitive functioning was "average and appropriate to experience fund of knowledge."  Id.  His insight was fair, and his judgment was good.  Id.  Dr. Loomis noted that plaintiff could dress, bathe, and groom himself; prepare food, clean, and do laundry; shop independently; manage money; and drive and take public transit.  Id. at 390.  Plaintiff reported socializing "rarely,' but had "two friends that he does see on occasion."  Id.  Further, he had a poor relationship with his parents, but good relationships with his girlfriend and sister.  Id.  He "reportedly enjoys paying music and will typically spend his day going to his appointments, staying home and playing music."  Id.

In her medical source statement set forth within her consultative report, Dr. Loomis determined that plaintiff could: (1) follow and understand simple instructions, (2) perform simple tasks independently, (3) maintain attention and concentration, (4) maintain a regular schedule and learn new tasks, (5) perform complex tasks with

supervision, (6) make appropriate decisions.  T at 390.  Dr. Loomis further determined

that plaintiff could not relate adequately with others or appropriately deal with stress,

and that "[t]he difficulties that he has are caused by his psychiatric symptoms."  Id. at

390-91.  Dr. Loomis opined that the examination results were "consistent with

psychiatric problems," but concluded that "in itself this does not appear to be significant

enough to interfere with the claimant's ability to function on a daily basis."  Id. at 391.

Her prognosis for plaintiff was "fair."  Id.  The ALJ accorded this portion of the opinion

"partial weight."  Id. at 21.  The ALJ rejected Dr. Loomis' conclusion that plaintiff could

not "relate adequately with others" or "appropriately deal with stress."  Id. at 390-931.


### 3.  Dr. Mahfuzur Rahman, M.D., Psychiatrist

Dr. Rahman performed an intake examination of plaintiff on June 1, 2010.  T at

270.  Dr. Rahman noted plaintiff's reports of gender identity issues, depression, and

anxiety.  Id.  Plaintiff reported to Dr. Rahman that "his thoughts and feelings are more

like a woman and he believes that he is a woman in a male body."  Id.  Plaintiff

indicated that he has not "contemplated or thought about a sex change, but he does not

believe that he should consider himself a male."  Id.  Plaintiff expressed "fear" of

disapproval by his parents if he "disclosed his identity" to them.  Id.  Dr. Rahman

diagnosed major depressive disorder, recurrent, severe without psychotic features;

anxiety disorder, NOS; Rule out panic disorder; gender identity disorder ("GID"), NOS;

and assessed a current Global Assessment of functioning (GAF)[11] of 65+.  Id. at 271.

Dr. Rahman recommended therapy for plaintiff's "gender identity issues."  Id. at 272.

### 4.  Dr. Robert Russell, E.D., Psychologist

Dr. Russell met with plaintiff twice in January 2012 to "review" the diagnostic criteria for Autism spectrum disorders and Schizoid Personality disorder.[12]  T at 289-90. Dr. Russell noted that plaintiff did not have language delays, but may have had a "slight articulation disorder" in childhood; had some difficulty reading and writing as a child, but no difficulties in math; was in the honor society in high school; and did not have any odd rituals or routines.  Id.  As for Schizoid personality disorder, Dr. Russell noted that "[h]e does appear to meet four (maybe 5) of the criteria for Schizoid Personality Disorder." Id.  Dr. Russell did not make any diagnoses regarding an autism spectrum disorder or Schizoid Personality Disorder.  Id.

### D.  The Parties' Arguments

---

[11]  "'The GAF scale was last used in the fourth edition of the DSM and reports an individual's psychological, social, and occupational functioning" and was viewed as "particularly useful in tracking the clinical progress of individuals in global terms, using a single measure."' DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., text rev.2000).  Evans v. Comm'r of Soc. Sec., 110 F. Supp. 3d 518, 536 (S.D.N.Y. 2015).  The GAF was dropped from DSM-5 'for several reasons, including its conceptual lack of clarity . . . and questionable psychometrics in routine practice.'"  Martinez v. Colvin, No. 15 CIV 01596 RAJCF, 2016 WL 3681426, at *3 (S.D.N.Y. June 15, 2016), report and recommendation adopted sub nom. Martinez v. Comm'r of Soc. Sec., No. 15-CV-1596 (RA), 2016 WL 3685092 (S.D.N.Y. July 6, 2016).

[12]  "Schizoid personality is characterized by introversion, social withdrawal, isolation, and emotional coldness and distancing.  Affected people are often absorbed in their own thoughts and feelings and fear closeness and intimacy with other people.  They are reticent, are given to daydreaming, and prefer theoretical speculation to practical action." THE MERCK MANUAL OF DIAGNOSES AND THERAPY 1555 (19th ed. 2011).

Plaintiff argues that the ALJ committed reversible error insofar as she: (1) failed to determine that plaintiff's GID, schizoid personality disorder, and Asperger's Syndrome[13] were severe impairments; and (2) concluded that plaintiff had the ability to deal with stress, relate with others, and maintain regular attendance. Dkt. No. 16. Defendant contends that substantial evidence supports the ALJ's determination. T at 17.

## 1. **Severity Analysis**

Citing to diagnoses of Asperger's Syndrome, Schizoid Personality Disorder, and Gender Identity Disorder, plaintiff contends that the "ALJ failed to assess all severe impairments and include the true limiting effect of those impairments in the RFC determination." T at 19. The Commissioner argues that substantial evidence supports the ALJ's determination that Plaintiff's GID, schizoaffective disorder, and Asperger's Syndrome were not severe impairments. The Commissioner further argues that, even if the ALJ erred in this regard, it is harmless because she found other mental impairments to be severe and proceeded with the sequential evaluation beyond step two. Dkt. No. 17 at 18.

---

[13] "Asperger's Syndrome is a developmental disorder akin to autism with the following characteristics: 'Language and cognition generally better than in autism; socially isolated and often viewed as odd or eccentric; clumsiness; repetitive patterns of behavior, interests, and activities; atypical sensory responses (e.g., exquisite sensitivity to noises, food odors or tastes, or clothing textures); pragmatic deficits (e.g., extremely concrete use of language or difficulty recognizing irony or jokes).'" Carrera v. Colvin, No. 1:13-CV-1414 (GLS/ESH), 2015 WL 1126014, at *2 (N.D.N.Y. Mar. 12, 2015) (citing Luckett v. Astrue, No. 2:09-cv-00037 (KJN), 2010 WL 3825703, at *1, n. 4 (E.D.Cal. Sept. 28, 2010) (quoting Mark H. Beers, M.D., et al., eds., THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 2487 (Merck Research Labs., 18th ed. 2006) (Merck Manual)).

The claimant bears the burden of presenting evidence establishing severity. Miller v. Comm'r of Soc. Sec., No. 05-CV-1371, 2008 WL 2783418, at *6-7 (N.D.N.Y. July 16, 2008); see also 20 C.F.R. § 404.1512(a).  In determining the severity of a mental impairment, the ALJ must apply the "special technique" set out in 20 C.F.R. § 404.1520a.  Where the ALJ recognizes that a claimant has a "medically-determinable mental impairment,"

> the ALJ must 'rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c),' which specifies four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). The first three areas (i.e., activities of daily living; social functioning; and concentration, persistence, or pace) are rated on a five-point scale: '[n]one, mild, moderate, marked, and extreme.' 20 C.F.R. § 404.1520a(c)(4).

Piazza v. Colvin, No. 13-CV-2230 JS, 2014 WL 4954598, at *8 (E.D.N.Y. Sept. 30, 2014).  Although the Second Circuit has held that this step is limited to "screen[ing] out de minimis claims," Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir.1995), the "mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment" is not, by itself, sufficient to render a condition "severe."  Coleman v. Shalala, 895 F.Supp. 50, 53 (S.D.N.Y.1995); Bergeron v. Astrue, No. 09-CV-1219, 2011 WL 6255372, at *3 (N.D.N.Y. Dec. 14, 2011).  Indeed, a "finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'" Rosario v. Apfel, No. 97-CV-5759, 1999 WL 294727, at *5 (E.D.N.Y.  Mar. 19,1999) (quoting Bowen v. Yuckert, 482 U.S. 137, 154 n. 12 (1987)).

16

As pertinent here, basic work activities are "the abilities and aptitudes necessary to do most jobs," including: "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling," as well as "[u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting."

Chavis v. Colvin, No. 5:12-cv-1634, 2014 WL 582253, at *2 (N.D.N.Y. Feb.13, 2014) (quoting 20 C.F.R. § 404.1521(b) (1), (3)-(6)).

Generally, where an ALJ finds that a claimant has at least one severe impairment at step two and continues with her analysis through the sequential evaluation, reviewing both severe and nonsevere impairments, a failure to find that some impairments were severe is not reversible error. See generally Reices-Colon v. Astrue, 523 F. App'x 796, 798 (2d Cir. 2013) (holding an error in failing to identify a severe impairment is harmless if that impairment is considered during the subsequent steps); Hall v. Colvin, 7:12-CV-1733 (GLS), 2014 WL 411543, at *2 (N.D.N.Y. Feb. 3, 2014); Bender v. Astrue, 09-CV-880 (TJM/VEB), 2010 WL 5175023 (N.D.N.Y. Nov. 29, 2010); 20 C.F.R. § 416.945(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' . . . when we assess your [RFC]."). "When the parties disagree over the effect of the ALJ's failure to include a condition at step two, resolution of 'this issue comes down to a question of whether there was substantial evidence to support the ALJ's conclusion that [the omitted condition] should not be included as 'severe impairment.'" Eralte v. Colvin, No. 14 CIV. 1745 JCF, 2014 WL 7330441, at *10 (S.D.N.Y. Dec. 23, 2014) (quoting Hussain v. Com'r of Soc. Sec., No. 13 Civ 3961,

2014 WL 4230585, at *7 (S.D.N.Y. Aug. 27, 2014) (citing 42 U.S.C. § 405(g)); Paz v. Comm'r of Soc. Sec., No. 14-CV-6885 (MKB), 2016 WL 1306534, at *14 (E.D.N.Y. Mar. 31, 2016) ("[W]here an ALJ's decision to exclude an impairment from the list of severe impairments is not supported by substantial evidence, and the ALJ fails to account for any functional limitations associated with the omitted impairments in determining the claimant's RFC, a court must remand for further administrative proceedings.") (citing Parker-Gross v. Astrue, 462 F. App'x 16, 17 (2d Cir. 2012)).

Thus, the undersigned must assess whether there is substantial evidence to support the ALJ's conclusions that Schizoid Personality Disorder, Asperger's Syndrome, and Gender Identity Disorder are not severe impairments. The ALJ noted that there is "some reference in the record to possible schizoid personality disorder and/or Asperger's syndrome" but indicated that plaintiff "has not had any tests for Asperger's syndrome, however." T at 14 (citing T at 486). Thus, "based on the claimant's diagnostic history and treatment notes," the ALJ determined that plaintiff's affective disorder, anxiety disorder, and personality disorder "are severe in combination. Id. In noting "some reference" to schizoid personality disorder and Asperger's in the record, the ALJ provides a citation to a January 27, 2012 progress note by Robert Russell, Ed.D., Psychologist. Id. at 486. This progress note indicated that "the diagnostic criteria for Autism spectrum disorders was discussed," and Dr. Russell reviewed that plaintiff did not have language delays, but had possible "slight articulation disorder" as a child; had some difficulty with reading and writing in early grades, but not math; was in the National Honor Society in high school; and had no odd rituals or routines". Id.

Reviewing the diagnostic criteria for Schizoid Personality disorder, Dr. Russell noted that plaintiff "does appear to meet four (maybe 5) of the criteria for Schizoid Personality Disorder." Id.

Further, it is not clear from the record whether plaintiff has been diagnosed with Gender Identity Disorder, Schizoid Personality Disorder, or Asperger's Syndrome. Although Dr. Russell *reviewed* Asperger and schizoid personality disorder, and observed that plaintiff did seem to demonstrate four or five symptoms of schizoid personality disorder, nothing in the record supports that he *approved* these proposed diagnoses. T at 486. In fact, Ms. Webb's treatment records indicate that she requested testing for Asperger's, but that these requests either were denied, not done because plaintiff was not agreeable to having his counseling sessions monitored, or because the reviewing provider indicated that plaintiff did not exhibit symptoms of an autism spectrum disorder. Id. at 296-97, 486. The record is also unclear regarding a diagnosis of Gender Identity Disorder. In September 2012, Ms. Webb, in a treatment note cosigned by Eric Lin, M.D., Ms. Webb noted that plaintiff had "unclear gender identity issues." Id. at 501. In December 2012, Ms. Webb indicated that plaintiff's "[g]ender identity issues persist but remain somewhat in the background primarily because of limited options for positive resolution of circumstances that mioght [sic] alleviate issues related to this." T at 449. A prior social worker, Patricia Jordan, also noted that plaintiff had "gender issues" that plaintiff believed "unlie [sic] his mental health problems" and "negative symptomology," yet Jordan did not note whether GID was part of her diagnosis. Id. at 444-45.

Although it is unclear whether plaintiff had a final diagnosis of Asperger's Syndrome, Gender Identity Disorder, or Schizoid Personality Disorder at the time of the hearing, even if Ms. Webb had issued plaintiff a definitive diagnoses,[14] she alone cannot establish the existence of an impairment because she is not an acceptable medical source. Anderson v. Colvin, 5:12-V-1008 (GLS/ESH), 2013 WL 5939665, at *3 (N.D.N.Y. Nov. 5, 2013) ("'An acceptable medical source opinion or diagnosis is necessary to establish existence of a medically determinable impairment."). Although Dr. Russell appears to have performed some review of whether plaintiff may suffer from an Autistic Spectrum Disorder or Schizoid Personality Disorder, the record does not demonstrate that he ever reached a definitive diagnosis regarding these conditions. Id.; T at 289. Regardless, even absent clear diagnoses as to these impairments, the ALJ still considered at subsequent steps whether plaintiff's impairments caused limitations,

---

[14] "Acceptable' medical sources are licensed physicians (medical or osteopathic doctors), psychologists, optometrists, podiatrists, and speech-language pathologists. 20 C.F.R. §§ 404.1513(a), 416.913(a). "'Other' sources are ancillary providers such as nurse practitioners, physician assistants, licensed clinical social workers, and therapists. 20 C.F.R. §§ 404.1513(d), 416.913(d). "'Other' source opinions, even when based on treatment and special knowledge of an individual, never enjoy controlling weight presumptions, nor can 'other' source opinion be relied upon to establish the existence of a medically determinable impairment. See SSR 06-03p, 2006 WL 2329939 (S.S.A.2006).

> When evaluating evidence from medical sources that are not considered 'acceptable' under the Regulations, the ALJ can consider: (i) how long the source has known and how frequently the source has seen the individual; (ii) how consistent the opinion is with other evidence; (iii) the degree to which the source presents relevant evidence to support an opinion; (iv) how well the source explains the opinion; (v) whether the source has a specialty or area of expertise related to the individual's impairment(s); and (vi) any other factors that tend to support or refute the opinion. See SSR 06-03p, at *4-5. 'Not every factor for weighing opinion evidence will apply in every case. The evaluation of an opinion from a medical source who is not an 'acceptable medical source' depends on the particular facts in each case. Id., at *5.

Chaffin v. Colvin, 999 F. Supp. 2d 468, 475 (W.D.N.Y. 2014).

as the regulations require.

Here, although the ALJ concluded that plaintiff's Gender Identity Disorder, Asperger's Syndrome, and Schizoid Personality disorder were not severe, the ALJ concluded that other mental impairments, "referred to broadly as affective disorder, anxiety disorder, and personality disorder are severe in combination" and proceeded with the application of the special technique to assess the impact of these conditions on his functioning.  T at 14-18.  In finding those impairments to be nonsevere, the ALJ concluded that plaintiff suffered mild restriction in his activities of daily living; moderate difficulties in social functioning; moderate difficulties in concentration, persistence, or pace; and experienced no episodes of decompensation.  Id. at 15-16.  The ALJ based her findings regarding plaintiff's ability to perform activities of daily living on plaintiff's ability to dress, bathe, and groom himself; prepare meals; do laundry; wash dishes; shop in stores; cook; listen to music; play the guitar; manage money; drive a car; and use public transit. Id. at 15.  She based further her findings regarding plaintiff's social functioning on plaintiff's ability to get along with family, friends, neighbors, and authority figures; that he socializes with a friend "a couple times per month for a few hours at a time," has a good relationship with his sister and girlfriend, with whom he lives; and plaintiff was cooperative, displayed adequate social skills, had appropriate eye contact, adequate expressive and receptive language skills, full range and appropriate affect during the consultative examination.  Id.  As to concentration, persistence, and pace, the ALJ noted that plaintiff reported that he is "usually able to follow instructions and finish what he starts"; is able to watch and understand movies, but chooses not to

21

concentrate on them when they lose his interest; plaintiff could perform calculations and serial 3s; and could recall three objects immediately and after five minutes.  Id. Further, the ALJ continued to review the impact of the severity of plaintiff's mental impairments after the step two analysis.  Id. at 17-18.  The ALJ concluded that the record evidence conflicted with the alleged severity of his mental impairments, acknowledging GAF scores showing moderate symptoms, mental status examinations showing normal findings, and results that showed good judgment and insight, friendly and cooperative behavior, good eye contact, good judgment, and good memory and concentration.  Id. at 18.

The ALJ reviewed Ms. Webb's findings regarding GID, including her conclusion that "other people's [sic] inability to accept his gender identity issues is what prevents him from working" as well as plaintiff's testimony about his GID.  T at 17-18, 341.[15]  In his hearing, plaintiff indicated that his gender identity issues, insofar as it relates to his employment made him feel "like I'm out of sorts.  I feel like I'm lying to everybody I deal with."  Id. at 48.  He indicated that police officers once asked his supervisor, "what is it?", "meaning, is it a male or a female" and that he had customers call him "miss, ma'am, sir, what the hell are you?"  Id. at 49.  Plaintiff explained that such situations are "awkward."  Id.  He acknowledged that these occurrences did not "solely" prevent him from working, but indicated that "it didn't help."  Id.  However, plaintiff did not indicate

---

[15]  Plaintiff takes issue with this portion of the ALJ's opinion, noting that in concluding that the mental health professionals' "seem[ed] to suggest" that it was others' reactions to plaintiff's gender identity issues that kept him from working, the ALJ committed "legal error" that "is not supported by substantial evidence."  Dkt. No. 16 at 21 (citing T at 17).  However, the undersigned finds this is an appropriate reading of the medical records.

that he suffered any additional specific limitations as a result of his gender identity issues that were separate and distinct from limitations he suffered from the mental impairments found to be severe. Similarly, plaintiff did not set forth any additional symptoms alleged to have been distinctly caused by Schizoid Personality Disorder or Asperger's Syndrome that were not considered by the ALJ within her review of plaintiff's other mental impairments.

Ultimately, substantial evidence supports the ALJ's determination that plaintiff's schizoid personality disorder, gender identity disorder, and Asperger's Syndrome were not severe impairments. In making her RFC determination, the ALJ considered plaintiff's complaints difficulty with his gender issues at past jobs, and considered his psychological symptoms from all alleged mental health issues, and weighed the medical opinion evidence before her. As the mental disability analysis continued beyond step two, and the ALJ considered claimant's severe and non-severe impairments in his RFC determination, any error at step two is, at most, harmless. See Tryon v. Astrue, No. 5:10-CV-537, 2012 WL 398952, at *4 (N.D.N.Y. Feb. 7, 2012); see also Plante v. Astrue, No. 2:11-CV-77, 2011 WL 6180049, at *4 (D.Vt. Dec. 13, 2011). Accordingly, remand is not needed on this ground.

### 2. Residual Functional Capacity Analysis: Plaintiff's Ability to Relate to Others, Handle Stress, Maintain Attendance

Plaintiff argues that the ALJ's conclusions that plaintiff could adequately relate to others, handle stress, and maintain regular attendance is unsupported by, and contrary

to, substantial medical evidence in the record.  T at 10.  Plaintiff contends further that

> [t]here are only two opinions of record concerning Plaintiff's
> ability to relate with others, They both find at least
> substantial loss in the ability to function in these areas.  The
> ALJ rejects both opinions.  While the ALJ is permitted to
> choose among competing opinions, she cannot reject
> uncontroverted medical opinions and, instead, substitute her
> own judgment.

Id. at 12.  Thus, plaintiff's argument essentially takes issue with the weight the ALJ

accorded to his therapist, Ms. Webb, and portions of treating examiner Dr. Loomis's

findings.

It is well settled that "the ALJ has discretion to determine the appropriate weight

to accord the [other source's] opinion based on all the evidence before him." Diaz v.

Shalala, 59 F.3d 307, 313-14 (2d Cir. 1995).  Although the assessments of social

workers are not entitled to enhanced weight as 'medical opinions,' these assessments

are nevertheless 'important and should be evaluated on key issues such as impairment

severity and functional effects." Paquette v. Colvin, 7:12-CV-1470, 2014 WL 636343, at

*6 (N.D.N.Y. Feb. 18, 2014).  Social Security Ruling 85-15 "emphasizes the need to

carefully evaluate a claimant's ability to deal with stress in the workplace." Lafond v.

Astrue, 6:12-CV-6046 (MAT), 2013 WL 775369, at *12 (W.D.N.Y. Feb. 28. 2013).

Further, it is well-established that

> [t]he basic mental demands of competitive, remunerative,
> unskilled work include the abilities (on a sustained basis) to
> understand, carry out, and remember simple instructions; to
> respond appropriately to supervision, coworkers, and usual
> work situations; and to deal with changes in a routine work
> setting.' SSR 85-15. 'A substantial loss of ability to meet any
> of these basic work-related activities would severely limit the
> potential occupational base.' Id.; SSR 96-9p ("When an

individual has been found to have a limited ability in one or more of these basic work activities, it may be useful to consult a vocational resource.")

Bohn v. Comm'r of Soc. Sec., No. 7:10-CV-1078 (TJM/DEP), 2012 WL 1048607, at *11 (N.D.N.Y. Mar. 5, 2012), report and recommendation adopted, No. 7:10-CV-1078, 2012 WL 1048867 (N.D.N.Y. Mar. 28, 2012) (quoting Malone v. Comm'r of Soc. Sec., No 08-CV-1249, 2011 WL 817448, at *9 (N.D.N.Y. Jan. 18, 2011), report and recommendation adopted, 2011 WL 808378 (N.D.N.Y. Mar. 2, 2011)).

### a. Ability to Interact with Others

The ALJ concluded that plaintiff had "no more than moderate difficulties" in social functioning.  T at 15.  In so concluding, the ALJ accorded "little evidentiary weight" to Ms. Webb's findings. The ALJ provided the following reasons for according such weight: (1) Ms. Webb is not an acceptable medical source, (2) Ms. Webb indicated that she had trouble answering questions in the disability forms, and (3) Ms. Webb's conclusion that plaintiff's serve impairments were present since 2004, "was contradicted by the fact that the claimant engaged in substantial gainful activity for several years after 2004 and did not stop working until 2011.  T at 20.

The ALJ observed that plaintiff socializes with a friend "a couple times per month for a few hours at a time[,]" "lives with his long-term girlfriend and reports that they have a good relationship[,]" and, although he has poor relationships with his parents, he has "good relationships with his parents and sister."  Id.  The ALJ opined that evidence suggests that plaintiff's relationship problems with his parents stem from their inability to

25

understand and/or accept the claimant's alleged gender identity issues." Id. The ALJ noted that, although plaintiff reports having trouble getting along with family, friends, neighbors, and authority figures; rarely socializing; and having "a long history of social anxiety and inability to commiserate," his friend "indicated that he generally socializes with the claimant a couple times per month for a few hours at a time." Id. The ALJ also observed that, although plaintiff told the consultative examiner that he lost his last job and others due to his difficulty dealing with people or supervisors, the record supported that plaintiff's jobs were terminated for selling alcohol to minors, damaging property, and allegedly stealing. Id. Further, the ALJ concluded that plaintiff demonstrated an "ability to interact appropriately with others," citing to plaintiff's consultative examination wherein he was described as appropriately groomed and dressed, exhibiting appropriate eye contact, adequate expressive and receptive language skills, and with a full and appropriate affect. Id. The ALJ further noted that the medical records demonstrated GAF scores of 65 in 2010 and 55 in 2012 and 2013, which showed "mild to moderate psychiatric symptoms and functional limitations." Id. at 18. The ALJ determined that "the evidence as a whole suggests that claimant has no more than moderate limitations in social functioning." Id. Thus, the ALJ concluded that, in limiting plaintiff to "isolated work involving only occasional supervision, occasional decision-making, occasional changes in the work setting, and occasional use of judgment, the undersigned has accounted for any limitations that are reasonably supported by the evidence of record." Id.

Plaintiff argues the ALJ did not address whether plaintiff had the ability to interact appropriately with others a sustained basis, instead concluding that plaintiff was not

"completely unable to deal with stress or relate adequately with others," which plaintiff claims is an incorrect standard.  Dkt. No. 16 at 16.  Plaintiff submitted medical evidence from Ms. Webb that addresses plaintiff's ability, or inability, to maintain appropriate social behaviors or interactions on a sustained basis.  T at 285, 475, 448-49. The ALJ reviewed Ms. Webb's statements as to plaintiff "maintaining a facade" and being able to appear "normal" for only short periods of time.  Id. at 17-18.  In response to this medical record, the ALJ concluded that "how other people would treat the claimant due to his sexual orientation and gender identity issues has no bearing on whether the claimant is disabled by this condition.  Rather this is an issue of workplace discrimination that is not relevant in determining the claimant's work-related functional limitations."  Id. at 18.

In January 2012, Ms. Webb noted that plaintiff "is quite adept at maintaining an opaque front when dealing with the public, but inside tends to be considerably anxious and mentally very uncomfortable.  His dealings with other human beings tend not to come naturally as it does for neurotypicals."  Id. at 475.  Ms. Webb indicated that plaintiff, "[o]n the surface . . . can almost pass for any neurotypical, in short bursts, as he has had ample time to learn just enough socially adherent behaviors to construct a facade.  Over sustained periods however his atypical cognitions and behaviors become quite apparent."  T at 449.  In a March 2012 treatment note, Ms. Webb noted that plaintiff is "intelligent and articulate but is unable to understand, assess, and navigate social stressors and boundaries in the way his peers do.  He may always find it difficult to be functional in social interactions and demands."  Id. at 285.  Ms. Webb further noted

27

that it "would not be unheard of" for plaintiff to find an employer who would be "willing to overlook some of [plaintiff's] unusual[] presentations[]; however, unless isolated from the general workforce it would seem, and has been, inevitable that [plaintiff] experiences ostracization from coworkers, colleagues, or any number of others in the socials [sic] environment because he so distinctly comes across as 'odd' or 'different' after the initial social engagement. " Id. Ms. Webb indicated, however, that isolation "would absolutely not be healthy" for plaintiff "because as with other individuals with Aspergers, he desires social connections and needs them as much as any other human being." Id. However, Ms. Webb noted that plaintiff "finds construction and maintenance of [social connections] to be 'challenging to say the least. Obviously, someone experiencing such a cognitive and emotional structure would necessarily experience hardship in functioning in ways 'normal' people take for granted, especially in social engagement." Id. In September 2013, Webb further noted that plaintiff has "largely avoided repercussions of his disability through grand efforts at maintaining a facade, but he can only sustain it for very short periods." Id. at 448. She opined that "most anything in his life that require investment of time and self is bound to reveal himself as 'different' in ways that make 'normal' people uncomfortable and distrusting. There is little doubt that this has contributed greatly to his continued vocational failures." Id.

Although the ALJ addressed one of Ms. Webb's records discussing her belief that plaintiff maintains a "facade," the ALJ reviewed these findings only in the context of his alleged gender identity issues, and dismissed them as "not relevant" as to whether plaintiff can work. T at 18. However, several of Ms. Webb's medical records that

28

discuss plaintiff's short-term ability to maintain a "facade" or appear "neurotypical" provide support that plaintiff has social limitations that are not solely due to "issues of workplace discrimination." Id. at 285, 448, 475. Insofar as the ALJ refers to plaintiff's largely normal mental status examinations, where he presented with: appropriate eye contact; no evidence of thought, perceptual, or psychomotor disturbances; euthymic mood and appropriate affect; friendly and cooperative; good memory and concentration; and intact insight and judgment to to support her conclusion that plaintiff had no more than moderate limitations in social functioning, such normal examinations alone do not contradict Ms. Webb and Dr. Loomis' findings of significant social limitations. Id. at 18, 21. This Court has previously held that an ALJ's "reference to clinical notes regarding Plaintiff's appearance and demeanor during medical examinations is unpersuasive" in concluding that the plaintiff had sufficient social skills as the "[p]laintiff's ability to maintain good hygiene and demonstrate adequate social skills during brief encounters with medical professionals are of limited relevance when compared to, for example, her ability to respond to changes in the work place and deal with stress. Malone, 2011 WL 817448, at *7 (citing SSR 96-9p) ("A substantial loss of ability to meet any one of several basic work-related activities on a sustained basis (i.e., 8 hours a day, 5 days a week, or an equivalent work schedule), will substantially erode the unskilled sedentary occupational base and would justify a finding of disability."). Similarly, although a GAF score – which is "intended to be used to make treatment decisions . . . and not disability determinations" – may be considered by an ALJ in making severity or RFC assessments, an ALJ cannot discount a medical providers testimony solely because he

finds it inconsistent with an assessed GAF score as "a GAF score does not have a direct correlation to the severity requirements in the [SSA's] disorder listings." See Garcia v. Colvin, 13-CV-6433P, 2015 WL 1280620, at *7-*8 (W.D.N.Y. Mar. 20, 2015) (citing cases) (internal citation omitted); Daniel v. Astrue, 10-CV-5397 (NGG), 2012 WL 3537019, at *10 (E.D.N.Y. Aug. 14, 2012).

As the undersigned finds that plaintiff's normal mental status examinations and moderate GAF scores, without more, do not amount to substantial evidence sufficient to warrant a reduction in the weight accorded to the medical opinions of Ms. Webb and Dr. Loomis relating to plaintiff's ability to interact appropriately with others, the matter is remanded to the Commissioner for reconsideration of plaintiff's ability to interact appropriately with others *on a sustained basis* of eight hours per day, and five days per week, or its equivalent.

### b. Ability to Handle Stress

The ALJ concluded that plaintiff "is not completely unable to deal with stress[.]" T at 21. In so determining, the ALJ accorded partial weight to Dr. Loomis' opinion that plaintiff could not appropriately deal with stress, concluding "it is not supported by the evidence of record." Id. The ALJ, as noted, accorded little evidentiary weight to Ms. Webb's findings in her questionnaire that plaintiff had marked limitations in his ability to manage stress. Id. at 20-21. The undersigned finds that this is error.

In concluding that plaintiff can appropriately deal with stress, the ALJ pointed to portions of the record that she contended conflict with Ms. Webb and Dr. Loomis'

findings of substantial limitations in handling stress.  T at 21.  Specifically, the ALJ referenced factors relevant to plaintiff's ability to interact with others.  She reiterated that plaintiff's reported problems getting along with family, friends, neighbors, and authority figures; losing jobs due to social problems; rarely socializing; his history of social anxiety; and an inability to commiserate.  Id.  Although it would not be unreasonable to conclude that one's social skills and stress management abilities are somewhat related, these functions are not one and the same; thus, the Court cannot understand how plaintiff's alleged social abilities provide support for the ALJ's conclusion that plaintiff's is able to manage stress – especially where plaintiff's treating therapist, Ms. Webb, and the consultative examiner, Dr. Loomis suggested otherwise.

"Because stress is 'highly individualized,' mentally impaired individuals 'may have difficulty meeting the requirements of even so-called 'low-stress' jobs,' and the Commissioner must therefore make specific findings about the nature of a claimant's stress, the circumstances that trigger it, and how those factors affect his ability to work."  Paquette, 2014 WL 636343, at *7 (quoting Stadler v. Barnhart, 464 F. Supp. 2d 183, 189 (W.D.N.Y.2006) and citing SSR 85-15, 1985 WL 56857, at *1 (SSR Jan. 1, 1985); Welch v. Chater, 923 F.Supp. 17, 21 (W.D.N.Y.1996)).  Here, although the ALJ noted that plaintiff was not "completely unable to deal with stress," the ALJ did not assess the circumstances that trigger stress and the impact of that stress on plaintiff's ability to work.  As both the treating therapist, Ms. Webb, and the consultative examiner, Dr. Loomis' determined that plaintiff was unable to deal with stress, the ALJ's failure to make these specific findings about plaintiff's ability to handle stress is not supported by

substantial evidence.

Accordingly, the matter is remanded to the Commissioner for specific findings about the nature of plaintiff's ability to handle stress, the circumstances that trigger it, and how those factors affect his ability to work on a sustained basis of eight hours per day, five days per week, or its equivalent, and the collection of additional medical evidence, if it is determined necessary to obtain to address these claims.

### c. Maintaining Regular Attendance

Plaintiff argues that the ALJ erroneously concluded that he had the ability to maintain regular attendance. Dkt. No. 16 at 25. Plaintiff contends that Ms. Webb concluded that plaintiff's symptoms and treatment "would reasonably cause him to be absent more than 3 days per month" and that "[t]here is no contrary opinion of record and, thus, this is an undisputed fact." Id. Plaintiff argues that Dr. Loomis' conclusion that plaintiff could maintain a regular schedule does not conflict with Ms. Webb's findings because maintaining a regular schedule is distinct from maintaining regular attendance. Id. at 25 n.8.

Although Ms. Webb concludes that plaintiff would be unable to maintain regular attendance and was likely to miss more than three days of work per month, there is little in the record regarding plaintiff's ability to maintain regular attendance. At the hearing, plaintiff appeared to indicate that his difficulty sleeping and GI issues precluded him from working or going to medical appointments early in the day, which resulted in scheduling conflicts with his past employers because he needed to attend medical appointments in

the evening, when he was scheduled to work.  T at 39-40.  Further, in her post-hearing and post-decision deposition, Ms. Webb appears to indicate that plaintiff could not maintain a regular schedule due to his sleep-related issues.  Id. at 516-17.

Plaintiff does not argue that the ALJ erred in concluding that plaintiff's gastrointestinal or sleep apnea issues were non severe.  Indeed, the ALJ reviewed plaintiff's claims of gastrointestinal issues, and noted that he had not sought treatment for those issues.  T at 18.  Similarly, insofar as plaintiff references sleep apnea in his disability application, the ALJ reasonably concluded that the sleep apnea caused no more than minimal work-related limitations.  Id.  Accordingly, the ALJ's conclusion that plaintiff could maintain regular attendance is not reversible error as there is insufficient support in the record to demonstrate that plaintiff has significant limitations in this area.  However, as it is possible that reconsideration on remand of plaintiff's ability to handle stress and interact appropriately with others may impact the Commissioner's assessment of plaintiff's ability to maintain regular attendance, the Commissioner should consider whether plaintiff's ability to handle stress and interact with others on a sustained basis impacts his ability to maintain regular attendance.[16]

### 3.  Additional Arguments Regarding Ms. Webb's Testimony

Plaintiff alleges two additional points of error regarding the ALJ's consideration of Ms. Webb's testimony.  Plaintiff argues that the ALJ improperly reduced the weight

---

[16]  In reaching this conclusion, the undersigned notes that it is unclear whether Dr. Loomis' conclusion that plaintiff can maintain a regular schedule is equivalent with a finding that he could maintain regular attendance.  Dkt. No. 16 at 23-24 n.8; T at 390.

assigned to Ms. Webb's opinion because his incorrectly reading of a medical record lead to an erroneous finding that Ms. Webb did not know how to fill out the disability forms, a factor that the ALJ considered in weighing Ms. Webb's opinion. Dkt. No. 16 at 16.

The ALJ did note that Ms. Webb "indicated in [sic] that she did not know how to appropriately answer questions in the claimant's disability forms." T at 20 (citing T at 477) ("Sees disability evaluators Oct 30 2012. Seems to need a lot of assistance completing forms. Unsure how to appropriately answer some of the questions."). The record before the Court, and before the Appeals Council, supports that Ms. Webb indicated that it was plaintiff who did not know how to answer the forms, not Ms. Webb. Id. at 515-16. However, this clarification was made at a deposition conducted by plaintiff's counsel on February 26, 2014,[17] after the hearing was held and after the decision was issued. Id.[18] Although the ALJ misinterpreted this statement Ms. Webb's statement and attributed the confusion to Ms. Webb, rather than to plaintiff, the ALJ did not rely solely on that finding in according lesser weight to Ms. Webb's opinion. Thus, the ALJ's erroneous interpretation of Ms. Webb's statement amounts to harmless error. However, as the Court is remanding the matter, the Commissioner is advised that on remand, any consideration of this medical record or reliance thereon should reflect that it

---

[17] The cover page transcript for the deposition states that it occurred on February 26, 2013. T at 510. Further, plaintiff's council refers to Webb's statements at this hearing as occurring in February 2013. Dkt. No. 16 at 8. However, the header of each page of the transcript indicates that the deposition occurred on February 26, 2014 as does the court reporter's certification. T at 528. Moreover, review of the transcript also provides support that the deposition occurred in February 2014. During the deposition, the plaintiff's attorney frequently asks Ms. Webb questions about the ALJ's January 21, 2014 decision. Further, the hearing occurred on November 15, 2013, making it impossible for the deposition – which discusses the hearing and the decision – to have occurred in February 2013.

[18] Ms. Webb's post-hearing decision deposition was submitted to the Appeals Council. T at 508.

was *plaintiff*, not Ms. Webb, who had difficulty answering the questions in the disability forms.

Plaintiff next contends that the ALJ erroneously considered Ms. Webb's statement in her questionnaire that plaintiff's limitations were in existence since 2004 because:(1) plaintiff last engaged in substantial gainful activity in 2009; (2) at plaintiff's last job in 2011, he worked only 18 hours per week; and (3) the ALJ's concession "that Plaintiff's mental impairments preclude him from performing his past work, but in the next breath state the fact that Plaintiff worked through 2011 contradicts Webb's opinion that Plaintiff cannot work?" is "internally inconsistent and, thus, not a legitimate basis for discounting Webb's opinion." T at 16.

An ALJ may properly consider a medical provider's testimony that may be incongruous with the plaintiff's alleged onset date. Here, plaintiff engaged in substantial gainful employment in 2009 and worked, in a part-time capacity, until 2011. T at 36. Thus, in concluding that plaintiff's symptoms were present since 2004, Ms. Webb's conclusions of significant limitations encompass a period of time during which plaintiff was engaging in substantial gainful employment. Ms. Webb's conclusions that plaintiff had severe limitations in his ability to perform work since 2004 necessarily conflicts with the fact that plaintiff engaged in substantial gainful employment until 2009, as Ms. Webb's findings, if true, would preclude any such work. An ALJ may properly assess conflicts in testimony or medical evidence, and his consideration of this conflict is proper. Plaintiff appears to contend that, because plaintiff was not employed in substantial gainful activity for this whole period of time, as his employment was sporadic during this

years, it was not improper for Ms. Webb to conclude that these severe limitations were present since 2004. The undersigned disagrees as an ability to engage in substantial gainful employment during this time period would demonstrate that plaintiff's limitations were not of a severity opined at that time.

Insofar as plaintiff argues that the ALJ erred in according less weight to Ms. Webb's opinion insofar as she concluded that plaintiff had these limitations from the time period between his last substantial gainful employment in 2009 to the onset date in 2011, because plaintiff did not have substantial gainful employment during this period, that he was engaged in part time employment does not require a finding that plaintiff's limitations could not have been as severe as Ms. Webb proposed. However, an ALJ may consider a claimant's part time work, even if it does not amount to substantial gainful employment, in assessing the severity of a claimant's impairments and in formulating his RFC. <u>Delucia v. Colvin</u>, 15-CV-898836, 2016 WL 898836, at *19 (W.D.N.Y. Mar. 19, 2016) (concluding that the ALJ could properly consider a claimant's part time work and his ability to satisfy those job requirements in evaluating his opined limitations). Thus, the ALJ did not err insofar as he concluded that the fact that plaintiff engaged in some work between his last substantial gainful employment and his onset date lessened the weight that should be given to Ms. Webb's findings that plaintiff's conditions – the severity of which, if true, would appear to be so limiting that they would prevent any level of work – existed during that time period. However, even if the consideration of this time period were improper, consideration is harmless as the ALJ did not reduce the weight accorded to Ms. Webb's opinions solely due to this finding.

Further, the Court disagrees with plaintiff's assertion that the ALJ's finding that plaintiff is currently unable to perform his past work was internally inconsistent with her conclusion to accord less weight to Ms. Webb's findings in her questionnaire insofar as she concluded that plaintiff's substantial limitations have been present since 2004. Dkt. No. 16 at 16. The ALJ's conclusion that plaintiff cannot perform any past work does not look back past the onset date – the ALJ determined whether plaintiff was disabled after July 6, 2011. The ALJ found fault insofar as Ms. Webb's questionnaire concluded that the serious limitations opined were present from 2004 at least until the onset date, as this was a period of time during which plaintiff did perform substantial gainful employment and other employment.

Accordingly, the undersigned finds no error insofar as the ALJ may have accorded less weight to Ms. Webb's findings insofar as she determined that the opined limitations were present from 2004 to the plaintiff's onset date due to the fact that plaintiff had, even if sporadically, worked during the period of time in which Ms. Webb claimed that plaintiff had symptoms so severe that it rendered him unable to work.

### III. Conclusion

Having reviewed the administrative transcript and the ALJ's findings, and for the reasons stated herein, the undersigned concludes that the Commissioner's determination is not supported by substantial evidence and that remand for further administrative action consistent with this Memorandum-Decision and Order is needed. Accordingly, it is hereby:

**ORDERED**, that plaintiff's motion for judgment on the pleadings (Dkt. No. 16) is **GRANTED** and that the matter is remanded to the Commissioner for additional proceedings pursuant to sentence four of 42 U.S.C. 405(g) for further proceedings consistent with this Memorandum-Decision and Order; and it is further

**ORDERED**, that the Commissioner's cross motion for judgment on the pleadings (Dkt. No. 17) is **DENIED**; and it is

**ORDERED**, that the Clerk of the Court serve copies of the Memorandum-Decision and Order on the parties in accordance with the Court's Local Rules.

**IT IS SO ORDERED.**

Dated: September 22, 2016
      Albany, New York

Christian F. Hummel
U.S. Magistrate Judge